# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

|  |  |  |
|---|---|---|
| **CONNIE JACKSON and** | ) | |
| **JEFFREY JACKSON** | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| **v.** | ) | **Dkt. 3:16-cv-716** |
| | ) | **McDonough/Shirley** |
| **LEMOND COMPANIES, LLC,** | ) | **(JURY DEMANDED)** |
| **LEMOND COMPOSITES, LLC,** | ) | |
| **GREG LEMOND,** | ) | |
| **NICOLAS WEGENER, and** | ) | |
| **ALEX JACOME** | ) | |
| *Defendants* | ) | |

## AMENDED COMPLAINT

COMES NOW the Plaintiffs, **Ms. Connie Jackson** ("Connie") and **Mr. Jeffrey Jackson** ("Jeff") (together the "Plaintiffs"), by and through the undersigned counsel, pursuant to Federal Rule of Civil Procedure 15, and hereby file this Amended Complaint. For their complaint against the Defendants, **LeMond Companies, LLC, LeMond Composites, LLC**, **Greg LeMond**, **Nicolas Wegener**, and **Alex Jacome** (together the "Defendants") the Plaintiffs do complain and allege as follows:

### I. PARTIES

1. Plaintiff, Connie Jackson, is a resident and citizen of Roane County, Tennessee.

2. Plaintiff, Jeff Jackson, is a resident and citizen of Roane County, Tennessee.

3. Defendant LeMond Companies, LLC is a Delaware limited liability company with its principal place of business at 1620 Central Avenue N.E., Suite 149, Minneapolis, Minnesota 55413 and its production facility at 103 Palladium Way, Oak Ridge, Tennessee 37830 ("Company"). Company may be served with process through its registered agent, Nicolas

1253248v2

1

Wegener. Company has three members: Defendants Greg LeMond and Nicolas Wegener and Plaintiff Connie, all of whom are residents and citizens of Tennessee.

4. Defendant LeMond Composites, LLC ("Composites") is a Delaware limited liability company with its principal place of business at 1620 Central Avenue N.E., Suite 149, Minneapolis, Minnesota 55413 and its production facility at 103 Palladium Way, Oak Ridge, Tennessee 37830. Composites may be served through its registered agent, LeMond Composites, LLC. Upon information and belief, it is a wholly-owned subsidiary of the Company.

5. Defendant Greg LeMond is a resident and citizen of Loudon County, Tennessee.

6. Defendant Nicolas Wegener is a resident and citizen of Knox County, Tennessee.

7. Defendant Alex Jacome is a resident and citizen of Roane County, Tennessee.

## II. JURISDICTION & VENUE

8. This Court has jurisdiction to adjudicate Plaintiffs' federal claims under 28 U.S.C. § 1331, the Wire and Electronic Communications Interception and Interception of Oral Communications Act, 18 U.S.C. § 2520, (the "Wiretapping Act") and the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (the "FLSA").

9. This Court has jurisdiction to adjudicate Plaintiffs' claims under state law pursuant to its supplemental jurisdiction under 28 U.S.C. § 1367(a).

10. Venue in this District is proper under 28 U.S.C. § 1391 because it is the judicial district in which all the Defendants reside and in which a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

11. Composites is registered with the Tennessee Secretary of State. Company has not qualified to engage in business with the Tennessee Secretary of State, but it is engaged in business in Tennessee by operating its production facility in Oak Ridge, Tennessee.

### III. SUMMARY OF THE CASE

12. Connie seeks relief pursuant to 18 U.S.C. § 2520, to recover civil damages for violations of the Wire and Electronic Communications Interception and Interception of Oral Communications Act by Defendants Wegener, LeMond, and Jacome.

13. Connie seeks relief pursuant to 29 U.S.C. § 215(a)(3) to recover back wages, emotional distress and other damages, liquidated damages, attorneys' fees and costs and all other remedies available under 29 U.S.C. § 216 against Defendants Wegener, LeMond, and Company for retaliation under the Fair Labor Standards Act.

14. Connie also seeks damages against the Defendants for (1) fraud or in the alternative, breach of contract and wrongful termination of Connie's employment in violation of the LeMond Executive Employee Employment Agreement which is attached as **Exhibit A**, (2) breach of the fiduciary duty of loyalty for improper transfers of Company's funds made by Defendant LeMond for his personal enrichment or the enrichment of other entities he owned or managed and for allowing non-employees and foreign nationals access to Company's confidential and proprietary technology, equipment designs, and financial information without requiring an executed non-compete and non-disclosure agreement or taking other appropriate measures to protect this confidential and proprietary information, (3) breach of the fiduciary duty of care for failure to manage and oversee Company's business and affairs in the best interest of Company and its members and failure to comply with applicable export control laws, and (4) wrongful removal of Connie as an officer and manager of Company in violation of Delaware common law or, in the alternative, the Second Amended and Restated Operating Agreement of LeMond Companies, LLC, dated October 11, 2016, which is attached as **Exhibit B** (the "Amended Operating Agreement").

15. Connie seeks relief under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 to declare the rights and legal relations between her and Company, under the LeMond Confidentiality, Noncompetition, and Nonsolicitation Agreement dated October 21, 2016, which is attached as **<u>Exhibit C</u>** (the "Non-Compete Agreement"). Specifically, Connie seeks a declaration that the Non-Compete Agreement is void as a matter of law because she was fraudulently induced into signing it or, in the alternative that the non-compete and non-solicitation provisions in the Non-Compete Agreement are unenforceable as a matter of law because there was no consideration given for the Non-Compete Agreement, because it lacks a reasonable geographic limitation on the non-compete, and because Company has no business interest that can be protected by these restrictive covenants.

16. Connie seeks an accounting of all of Company's accounts, books, and records and specifically of all transfers made from Company accounts to any other entity of which any of the Defendants or any of their immediate family members have been an owner, officer, director, or manager or any payments or reimbursements made using Company funds for the personal benefit of any of the Defendants, their family members, or any entity in which any of them are owners, officers, directors, or managers.

17. In light of the improper and unlawful acts of Defendants LeMond and Wegener, Connie seeks an order dissolving Company and distributing its assets.

18. Jeff seeks to recover unpaid wages, unpaid overtime, liquidated damages, and attorneys' fees from Company, Composites, Wegener, and LeMond under the FLSA because he was a joint employee of Company and Composites and both failed to pay him at least the minimum wage and overtime pay for the work performed by Jeff and because Wegener and LeMond had a significant interest in Company and Composites and operational control over

significant aspects of their day-to-day functions, including those functions related to employee compensation, hours worked, and job duties.

## IV. FACTS RELEVANT TO ALL CAUSES OF ACTION

### A. The Parties and Background

19. For twenty-seven years, Connie has worked in the development and production of carbon fiber materials and technologies.

20. She holds a bachelor's degree in Industrial Engineering from Tennessee Tech University.

21. Over the course of her career, she has worked as an engineer for companies such as Fortafil Fibers, Inc. and Toho Tenax America, Inc. (Diversified Structural Composites), and was a contract Project Manager for Bechtel Power at the TVA Watts Bar Nuclear Plant.

22. From January 2011 until May 2016, she worked for Oak Ridge National Laboratory ("ORNL") as the Operations and Technology Manager of its Carbon Fiber Technology Facility ("CFTF"), a 42,000 square foot innovative technology facility. Connie managed CFTF from the time of its initial construction and oversaw the selection and installation of its equipment as well as the carbon fiber technology research and development performed at CFTF.

23. Over the course of her career, Connie has developed numerous contacts in the carbon fiber industry. She developed contacts with raw material and equipment vendors and suppliers as well as the entities, organizations, and individuals who produce, sell, or use carbon fiber materials.

24. While she was an ORNL employee, Connie and a colleague invented a unique process for producing a high-volume, low-cost carbon fiber material (the "Carbon Fiber Process"). UT-Batelle is the owner of the Carbon Fiber Process, and it has applied for a formal

patent from the United States Patent and Trademark Office. Connie is listed as a co-inventor of the Carbon Fiber Process on the patent application.

25. Upon information and belief, Defendant LeMond is the owner, officer, or manager of numerous entities, including, but not limited to, LeMond Revolution, L.L.C. LeMond Technologies, LLC, and LeMond Bicycles, LLC.

26. Upon information and belief, Defendant Wegener is an officer, director, or manager of several of Defendant LeMond's entities including LeMond Technologies, LLC, Company, and Composites.

27. Upon information and belief, Defendant Jacome is an employee of LeMond Bicycles, LLC. Upon information and belief, during the relevant time periods, Defendant Jacome was identified as a Business Development Specialist for LeMond Composites and LeMond Bicycles.

28. Upon information and belief, at all times relevant to this Amended Complaint, Company and Composites have been for-profit limited liability companies engaged in the business of developing and manufacturing carbon fiber materials using goods and materials which have been shipped across state lines.

29. Jeff is Connie's husband. From August 2016 to December 2016, Jeff was a joint employee of Company and Composites who was engaged in the use of goods and materials that have been moved in or produced for interstate commerce, making telephone calls to persons located in other states, and traveling to other states for purposes of Company and Composites business.

## B. Formation of LeMond Composites and LeMond Companies

30. Defendant LeMond and Connie met each other in 2015 when Defendant LeMond made several visits to CFTF, of which Connie was the manager.

31. After much discussion, Defendant LeMond and Connie decided to go into the carbon fiber manufacturing business together, and in February 2016, they organized Composites. Connie and Defendant LeMond each owned 50% of Composites, and both were officers and directors of Composites.

32. In February 2016, Connie, Defendant LeMond, and Defendant Wegener then organized Company. Upon information and belief, Company was intended to be a holding company which would wholly own Composites, LeMond Bicycles, LLC, and LeMond Technologies, LLC.

33. Upon information and belief, neither Defendant LeMond nor Defendant Wegener had any prior technical education, experience or training in carbon fiber manufacturing or technology prior to going into business with Connie.

34. The members, officers, and managers of Company were Connie, Defendant LeMond, and Defendant Wegener.

35. Defendant LeMond owned 54% of Company's membership units, Connie owned 41% of the membership units, and Defendant Wegener owned 5% of the membership units.

36. On February 29, 2016, Connie, Defendant LeMond, and Defendant Wegener signed Contribution Agreements in which each agreed to contribute certain capital or know-how in exchange for membership units in Company. Upon information and belief, Connie and Defendant LeMond then contributed their respective membership interests in Composites to Company.

37. Upon information and belief, the membership interests of LeMond Bicycles, LLC, and LeMond Technologies, LLC were not contributed to Company such that they are not wholly owned subsidiaries of Company.

### C. The ORNL/UT-Battelle License & Connie's Employment with Company

38. Soon after Company was organized, Company applied for a license from ORNL/UT-Battelle to use the Carbon Fiber Process with the goal of using the Carbon Fiber Process to manufacture low-cost carbon fiber beginning in 2018.

39. At the time, Connie was still an employee of ORNL with a six-figure salary, a pension, a 401(k) with significant matching benefits, and lifetime healthcare benefits for herself and her spouse, Jeff.

40. Upon information and belief, Defendants LeMond and Wegener learned that ORNL/UT-Battelle were unlikely to approve the application to license the Carbon Fiber Process because neither had any education, experience, or training in carbon fiber technology.

41. To induce Connie to terminate her employment at ORNL and become an employee of Company, in the Spring of 2016, Defendant LeMond represented to her that there was no risk of ever being fired by Company and that he would personally guarantee to pay her salary if the carbon fiber manufacturing business contemplated failed. Defendant Wegener represented that LeMond Technologies, LLC, which was supposed to be a wholly owned subsidiary of Company, had a contract with Apple Inc. which would generate substantial revenues for Company.

42. In reliance on Defendants LeMond and Wegener's representations, in May 2016, Connie voluntarily terminated her employment at ORNL to become an employee of Company. Connie's total compensation as an employee of Company was less than her total compensation while employed at ORNL.

43. When she became an employee of Company, Connie was not asked to sign an employment agreement, non-compete agreement, confidentiality agreement non-disclosure agreement, or any other agreement related to her employment. In fact, Connie insisted to

Defendant LeMond that she would not agree to be subject to a non-compete until Company raised a substantial amount of capital from investors.

44. Although Connie was named the CEO of Company, Defendants LeMond and Wegener refused to give her access to Company's books and records, including its financial records. They did not allow her any decision-making authority over Composites or any of the other purported subsidiaries

45. Connie was not involved in decisions regarding the wages, compensation, or day-to-day job duties of Company's employees. She did not have access to Company's checkbook, and did not have the authority to generate checks or require Company to make a payment. Defendant LeMond's wife and Defendant Wegener had authority over payroll and paying Company's other obligations.

46. In effect, Connie was a CEO in name only.

47. In June 2016, ORNL/UT-Battelle notified Company that its application to license the Carbon fiber process was approved. The license agreement was signed in August 2016.

48. Upon information and belief, Company was the first licensee of the Carbon Fiber Process and the only licensee at the time this action was filed.

**D. Jeff's Uncompensated Employment**

49. In August 2016, Jeff began working for both Company and Composites. He supervised the contractors who performed some of the renovations to the Composites facility, performed other aspects of the renovation work himself, negotiated with vendors and suppliers for the renovation, and began negotiating a maintenance contract for the facility.

50. Jeff also supervised the installation of equipment in the facility, performed maintenance on the equipment, made telephone calls on behalf of both Company and

Composites to vendors and other individuals outside the state of Tennessee, and travelled outside the state of Tennessee on business for both Company and Composites.

51. Composites also provided Jeff with a company e-mail account and a laptop computer so that he could correspond with the contractors and vendors.

52. Defendants LeMond and Wegener supervised Jeff in the work performed, observed Jeff performing the foregoing work and, upon information and belief, both had full knowledge of the work he performed.

53. From August to October 2016, Jeff worked an average of at least fifty (50) hours per workweek. From October to December 9, 2016, Jeff worked an average of 30 hours per workweek.

54. Neither Company nor Composites compensated Jeff at or above the federal minimum wage for any of the work he performed. In fact, neither Company nor Composites paid any wages to Jeff for the work he performed.

55. Neither Company nor Composites paid Jeff overtime for the hours worked over 40 in a workweek.

56. Connie complained to Defendant LeMond and Defendant Wegener about Company and Composite's failure to pay Jeff at least the federal minimum wage. The Defendants still refused to cause Company or Composites to pay Jeff claiming that it would be nepotism because Jeff was Connie's husband. Because Connie had no authority over either Company's or Composites' finances, access to their financial records, or the ability to write checks or make other payments on behalf of either Company or Composites, she was powerless to require either entity to pay wages to Jeff.

### E. September 2016: Misuse of Company's Funds and Failure to Protect Confidential Technology and Information

57. In August or September 2016, Connie learned that Defendant LeMond had been using Company funds for his personal benefit. Upon information and belief, this included (1) using Company funds to pay for his wife and three children to travel with him to the Tour de France, even though none of them were employees of Company or Composites; (2) purchasing approximately $30,000.00 of office furniture for Defendant LeMond's son, who worked for another of Defendant LeMond's entities; and (3) transferring money from a Company escrow account intended to hold money received from investors in the Company to another of Defendant LeMond's entities—LeMond Revolution, L.L.C.

58. Upon learning of these improper uses of Company funds, Connie complained to Defendant LeMond and demanded that he repay the funds to Company.

59. In September 2016, Connie also learned that Defendant LeMond, on behalf of the Company, had executed a contract with Solve Branding, LLC, a Minneapolis, Minnesota marketing company (the "Solve Contract").

60. Upon information and belief, the Solve Contract required the Company to pay a monthly fee of $63,000.00. Defendant LeMond did not obtain Board approval to execute the Solve Contract.

61. Defendant LeMond signed the Solve Contract committing the Company when it had only had a license to use the Carbon Fiber Process for 1 month, when it did not have an operation production facility, and when it was still at least two years away from producing a marketable product.

62. Also, in September 2016, Connie learned that Defendant LeMond had given Defendant Jacome access to confidential information about the Carbon Fiber Process,

confidential designs for equipment to be used in implementing the Carbon Fiber Process, confidential customer and investor contact information, and confidential business plans and financial information of the Company. Upon information and belief, Defendant LeMond did not require that Defendant Jacome sign a non-disclosure or non-compete agreement or take any other steps to protect the confidentiality of the information and technology which he allowed Defendant Jacome to review.

63. When Connie learned that Defendant Jacome had been given access to the Company's confidential information and technology, she complained to Defendant LeMond and demanded that he require Defendant Jacome to sign a non-competition and non-disclosure agreement if he was to have access to the Company's confidential information and technology.

64. Upon information and belief, Defendant Jacome has never been asked or required to sign a non-disclosure agreement, and Defendant LeMond has not taken any reasonable steps to protect the confidentiality of the Company's information or technology.

**F. October 2016: Execution of the Amended Operating Agreement, Employment Agreement, and Non-Compete Agreement**

65. On the morning of October 11, 2016, Connie's mother passed away unexpectedly.

66. Later that morning, Defendants LeMond and Wegener informed Connie that they needed to have a Board meeting that afternoon.

67. It was the first official Board meeting ever held by Company, and Defendants LeMond and Wegener represented to Connie that they needed to have a Board meeting because investors wanted to see that Company observed corporate formalities.

68. Connie attended the Board meeting, and at the meeting, Defendants LeMond and Wegener presented her with the Amended Operating Agreement and represented that the changes were solely for the purpose of formalizing Connie and Defendant LeMond's titles.

69. Given her emotional state from her mother's death that morning, the urgency of the Board meeting, Defendants LeMond and Wegener's representations, and their insistence that she sign, Connie signed the Amended Operating Agreement on October 11, 2016.

70. Ten (10) days later, on October 21, 2016, Defendant Wegener showed up at Connie's office unannounced with the Employment Agreement (attached as **Exhibit A**) and the Non-Compete Agreement (attached as **Exhibit C**) in hand.

71. Defendant Wegener represented to Connie that a potential investor was going to make a significant investment, but was insisting that she sign the two agreements before it would make the investment.

72. When Connie said she wanted to have the agreements reviewed by an attorney, Defendant Wegener represented that there was no time to have an attorney review the agreements because the investor was prepared to make the investment the next day but only if it saw the signed Employment Agreement and Non-Compete Agreement that same day.

73. Defendant Wegener further represented to Connie that she did not need to have an attorney review the agreements because they had been prepared by his attorney, they were the same as the employment agreement and non-compete agreement he had signed, and they contained terms very favorable to Connie.

74. Based on these representations, Connie signed the Employment Agreement and the Non-Compete Agreement the same day. Defendant Wegener counter-signed the Employment Agreement and the Non-Compete on behalf of Company.

75. Prior to October 21, 2016, Connie did not have an employment agreement or any employment-based restrictive covenants with Company and had never been asked to execute any such agreements.

76. The next day, the investor did not make an investment in Company. Upon information and belief, this investor has never made an investment in Company.

77. Two weeks after Connie signed the Employment Agreement and the Non-Compete Agreement, Defendants LeMond and Wegener informed her that Company did not intend to pursue a relationship with the potential investor Defendant Wegener claimed had demanded that Connie sign the Employment Agreement and Non-Compete Agreement.

78. Upon information and belief, the representations described in Paragraphs 71 to 73 were false when made because Defendant Wegener knew the investor had not conditioned its investment on Connie's execution of the Employment Agreement and Non-Compete Agreement, and knew his attorney had not drafted the agreements. Moreover, upon information and belief, when Defendant Wegener made the representations described in Paragraphs 71 to 73, he did so knowing that the representations were false when made and solely for the purpose of inducing Connie to sign the Employment Agreement and Non-Compete Agreement.

79. Upon information and belief, Defendant Wegener made these false representations knowing that Company was going to terminate Connie's employment a short time later.

80. Upon information and belief, Defendant Wegener made these false representations in order to induce Connie to sign agreements which, if enforceable, could potentially restrict Connie's ability to use her decades of prior experience and contacts in the carbon fiber industry to obtain employment in the carbon fiber industry after the Company terminated her employment a short time later.

81. Pursuant to the Employment Agreement, the Company agreed to pay Connie a signing bonus of $80,000.00 in two installments. The Company was obligated to pay the first installment of $40,000.00 within fifteen (15) days after execution of the Employment

Agreement, and the second installment of $40,000.00 six (6) months after execution of the Employment Agreement. To date, the Company has not paid the first installment of $40,000.00 even though it has been more than fifteen (15) days since the execution of the Employment Agreement on October 21, 2016.

82. Company did not pay Connie any additional compensation or benefits as consideration for signing the Employment Agreement or the Non-Compete Agreement.

### G. Recording of Communications & Telephone Calls without Consent

83. In November 2016, Connie and Defendants LeMond, Wegener and Jacome travelled to California to meet with representatives of Tesla Motors about forming a business relationship.

84. Upon information and belief, Defendant Jacome made an audio recording of the meeting, including the oral communications of Connie and the Tesla Motors representatives, without informing Connie or the Tesla Motors representatives that he was doing so and without first obtaining their consent.

85. Upon information and belief, Defendant Jacome was in violation of California law by recording a conversation without the consent of all of the parties to the conversation.

86. Upon information and belief, Defendant Jacome intentionally disclosed the surreptitious recordings to Defendants LeMond and Wegener.

87. Upon information and belief, Defendants LeMond and Wegener knew that recording was made without the consent of Connie or the Tesla Motors representatives, but nonetheless, have attempted to use the recording as leverage against Connie.

88. Also in November 2016, Connie had a conference call with several representatives of Lucintel, a consulting and market research company. The purpose of the conference call was to explore a potential relationship between the Company and Lucintel for consulting work.

89. Upon information and belief, the only people invited to participate in the conference call were Connie, Don Naab, a Composites employee, and the Lucintel representatives.

90. Defendant Jacome learned of the conference call, joined the call, and contemporaneously recorded it without giving notice to or obtaining the consent of Connie, Don Naab or the Lucentil representatives. Upon information and belief, none of the invited participants to the call knew that Defendant Jacome was on the call or recording the call.

91. Upon information and belief Defendant Jacome intentionally intercepted Connie's oral and electronic communications and then intentionally disclosed the recorded, intercepted telephone call to Defendants LeMond and Wegener.

92. Upon information and belief, Defendants LeMond and Wegener knew that the recorded telephone call provided by Defendant Jacome was intercepted and recorded without the consent of any of the invited participants on the call.

93. Upon information and belief, Defendant Jacome has made other recording of telephone calls and oral communications without Connie's or Jeff's knowledge or consent, including but not limited to, a second call between Connie and the Tesla Motors representatives while Connie was in Florida and the Tesla Motors representatives were in California, and a meeting between Connie and Jeff and representatives of Alta in California all of which violated of federal and state law. Upon information and belief, Defendant Jacome has then disclosed these recordings to Defendants LeMond and Wegener.

94. Since Company terminated Connie's employment, as described below, Defendants LeMond and Wegener have used the intercepted, recorded telephone calls to attempt to force Connie to mediate her claims against the Defendants in this lawsuit.

### H. November 2016: Transportation of Confidential and Proprietary Technology Outside the United States and Disclosure to Foreign Nationals

95. In November 2016, Defendants LeMond and Wegener sent three employees of Composites or Company to Australia to discuss the Carbon Fiber Process with individuals at Deakin University, which has its own carbon fiber research facility.

96. Defendants LeMond and Wegener did not consult with Connie or even inform her of the trip prior to sending the employees to Australia.

97. Upon information and belief, the Carbon Fiber Process and technical data and detailed documentation about the Carbon Fiber Process is technology protected by the Export Administration Regulations (the "Controlled Technology"), and a consultation and potentially a license from the U.S. Bureau of Industry and Security (the "BIS") is required before the Controlled Technology can be taken outside the territorial boundaries of the United States or shared with foreign nationals.

98. Upon information and belief, these employees took the Controlled Technology with them on their trip to Australia and disclosed the Controlled Technology with individuals at Deakin University including individuals who are Chinese nationals.

99. Upon information and belief, Defendants LeMond and Wegener did not consult with the BIS or obtain any federal or state licenses or permissions before sending the employees on the Australia trip or otherwise take any steps to prevent the removal of the Controlled Technology from the United States or its disclosure to foreign nationals.

100. Upon information and belief, the employees took Controlled Technology outside the territorial boundaries of the United States and shared it with foreign individuals either at the express direction of Defendants LeMond and Wegener or with Defendants LeMond and Wegener's knowledge and permission.

1253248v2

17

101.     Upon learning that the employees had been sent to Australia, had taken the Controlled Technology outside the United States, had potentially disclosed it to foreign individuals and entities, and had apparently done so without first obtaining an export license or consulting with the BIS, Connie complained to Defendants LeMond and Wegener and demanded that they cause Company or Composites to consult with the BIS immediately.

102.     In response, Defendants LeMond and Wegener became very angry and informed Connie that she was to have no involvement in any activities or decisions involving interactions with Deakin University in Australia.

103.     Upon information and belief, after Connie's employment was terminated, Defendants LeMond and Wegener or their employees have taken additional trips to Australia where they accessed Controlled Technology and disclosed it to foreign nationals.

## I. December 2016: Termination of Connie & Jeff's Employment, Removal of Connie as Manager and Officer of the Company, and Attempted Rescission of the Contribution Agreement

104.     On December 9, 2016, exactly seven (7) weeks from the day Connie was fraudulently induced to sign the Employment Agreement and the Non-Compete Agreement, Defendant LeMond provided Connie with a letter which is attached as **Exhibit D** (the "Termination Letter").

105.     The Termination Letter purports to terminate Connie as Chief Executive Officer and remove her as Manager for "Cause" pursuant to Section 3.2.2(i) and (v) of the Operating Agreement.

106.     The Operating Agreement provides that a manager or officer can be removed only by the unanimous consent of the Board unless the removal is for "Cause." If the removal is for "Cause," a majority of the managers must approve the removal.

107.    The Termination Letter is signed by Defendant LeMond individually.

108.    Prior to receiving the Termination Letter, Connie was not given notice of a Board meeting in which her removal as officer and manager was on the agenda.

109.    Upon information and belief, the decision to remove Connie as officer and manager of LeMond Companies was not made either by unanimous consent of the Board or by a majority of the Board as required by the Operating Agreement but was made solely by Defendant LeMond.

110.    The Termination Letter also purports to terminate Connie's employment effective immediately.  Jeff's employment was terminated the same day as well.

111.    Paragraph 3 of the Employment Agreement provides that Connie's employment can be terminated only for "Just Cause."  "Just Cause" is defined as follows: "Executive's repeated and willful failure after more than two written notices, and over a period of more than sixty (60) days, to perform the duties of her position ("Just Cause")."

112.    Prior to receiving the Termination Notice, Connie was not given written notice of any "repeated and willful failure" which she allegedly made and certainly was not given two (2) written notices over a period of more than sixty (60) days.

113.    Pursuant to the Employment Agreement, if the Company terminated Connie's employment for any reason other than for "Just Cause," she was entitled to severance payments equal to one year's Base Salary, which was $300,000.00 per year.

114.    Since the termination of her employment, Connie has not been paid any amount of severance.

115.    Also on December 9, 2016, Defendant LeMond provided Connie with a letter which is attached as **Exhibit E** (the "Rescission Letter").

1253248v2

19

116.    The Rescission Letter asserts that Connie was in breach of the Contribution Agreement because she failed to document certain business or technological processes.   The processes identified in the Rescission Letter were processes that had not yet been developed, did not exist as of December 9, 2016, and therefore could not have been documented at that time.

117.    Notwithstanding, based on Connie's alleged breach, the Rescission Letter asserts that the Contribution Agreement signed by Connie was never enforceable and therefore unilaterally rescinded.

118.    The Rescission Letter is signed by Defendant LeMond individually.

119.    Upon information and belief, the purpose of the Rescission Letter was an attempt by Defendant LeMond to secure Connie's interest in the Company for himself and Defendant Wegener.

**COUNT I**
**VIOLATIONS OF THE WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS ACT, 18 U.S.C. § 2510, *et. seq***

120.    Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 119 by reference and further allege as follows:

121.    Defendant Jacome violated the Wiretapping Act by recording oral conversations with Connie and the Tesla representatives in California and Florida without obtaining the consent of all parties to the conversation, including Connie and the Tesla representatives.

122.    Defendant Jacome violated the Wiretapping Act by intentionally joining the conference call between Connie, Don Naab and the Lucintel representatives without their knowledge or consent and then contemporaneously recording the conference call without their knowledge or consent.

123.    Upon information and belief, Defendant Jacome has violated the Wiretapping Act by recording other oral conversations and telephone calls between Connie, Jeff, and other individuals without the consent of Connie or Jeff.

124.    The foregoing constitutes an intentional interception of a wire, oral, or electronic communication in violation the Wiretapping Act.

125.    Defendant Jacome further violated the Wiretapping Act by intentionally disclosing the unlawfully intercepted or obtained recordings to Defendants LeMond and Wegener.

126.    Defendants LeMond and Wegener have violated the Wiretapping Act by intentionally using the unlawfully obtained recordings in an attempt to force Connie to mediate her claims against the Defendants knowing that the recordings were made through the unlawful interception of a wire, oral, or electronic communication.

127.    As a result of these violations of the Wiretapping Act, Connie and Jeff are entitled to relief under 18 U.S.C. § 2520 in an amount to be determined at trial, but no less than the statutory minimum for each and every violation of the Wiretapping Act.

## COUNT II
## FAILURE TO PAY MINIMUM WAGE AND OVERTIME IN VIOLATION OF OF THE FAIR LABOR STANDARDS ACT, 29 U.S.C. §§ 201, *et seq.*

128.    Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 127 by reference and further allege as follows:

129.    At all times relevant to this Amended Complaint, Company and Composites were "employers" for purposes of the FLSA.

130.    At all times relevant to this Amended Complaint, Defendants LeMond and Wegener were also "employers" for purposes of the FLSA because they had a significant interest

in Company and Composites and operational control over significant aspects of their day-to-day functions, including those functions related to employee compensation, hours worked, and job duties, and specifically exercised control over the payment of wages to employees.

131.    From August to December 2016, Jeff was a joint employee of Defendants Company, Composites, LeMond, and Wegener who was covered by the FLSA because his work for them regularly involved him in interstate commerce.

132.    From May 2016 to December 2016, Connie was a joint employee of Defendants Company, LeMond, and Wegener who was covered by the FLSA because her work for them regularly involved her in interstate commerce.

133.    At all times relevant to this Amended Complaint, Defendants LeMond and Wegener were fully aware of the work Jeff performed for Company and Composites.

134.    During the course of his employment, both Company and Composites failed to pay Jeff any wages for any of the work he performed, and Defendants LeMond and Wegener failed to cause Company or Composites to pay any wages for the work he performed.

135.    During the course of his employment, Jeff regularly worked more than forty (40) hours in many workweeks for both Company and Composites and neither compensated him at the overtime rate required under the FLSA.

136.    Company, Composites, Defendant LeMond, and Defendant Wegener violated Section 206 of the FLSA by failing to pay Jeff at least the federal minimum wage for every hour worked in a workweek.

137.    Company, Composites, Defendant LeMond, and Defendant Wegener violated Section 207 of the FLSA by failing to pay Jeff overtime pay at a rate of one-and-one-half times the regular rate at which he was employed for each hour worked over forty (40) in a workweek.

138.     These violations of the FLSA were knowing and willful in violation of Jeff's rights under the FLSA.

139.     As a result of these violations of the FLSA, Jeff is entitled to all remedies available to him under the FLSA including, but not limited, back wages for each hour he worked, overtime pay for each hour worked over forty (40) in a workweek, liquidated damages, prejudgment interest, and his attorneys' fees and costs in an amount to be determined at trial, and Defendants Company, Composites, LeMond and Wegener are jointly and severally liable for each of the foregoing.

**COUNT III**
**RETALIATION IN VIOLATION OF**
**THE FAIR LABOR STANDARDS ACT, 29 U.S.C. §§ 201,** *et seq.*

140.     Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 139 by reference and further allege as follows:

141.     Connie repeatedly complained to Defendants LeMond and Wegener about their failure to pay Jeff any wages or overtime compensation and their failure to cause Company or Composites to pay Jeff any wages or overtime compensation.

142.     Because Defendants LeMond and Wegener refused to give Connie any authority over Company's finances, access to Company's financial records, or the ability to write checks or make other payments on behalf of Company, she was powerless to require Company to pay wages to Jeff.

143.     Within a few months of her complaints regarding Company and Composite's failure to pay Jeff any wages or overtime compensation, Connie's employment was terminated.

144. Upon information and belief, the termination of Connie's employment was in retaliation for Connie's complaints about the failure to pay Jeff wages and overtime compensation all of which was in violation of the FLSA.

145. The retaliation against Connie by terminating her employment was knowing and willful and in violation of Connie's rights under the FLSA.

146. As a result of these violations of the FLSA, Connie is entitled to all remedies available to her under the FLSA including, but not limited, back wages, overtime pay for each hour worked over forty (40) in a workweek, liquidated damages, prejudgment interest, and her attorneys' fees and costs in an amount to be determined at trial, and Defendants Company, LeMond and Wegener are jointly and severally liable for each of the foregoing.

## COUNT IV
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201 AND FEDERAL RULE OF CIVIL PROCEDURE 57

147. Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 146 by reference and further allege as follows:

148. Covenants not to compete are disfavored as a restraint of trade and are to be construed strictly in favor of the employee. A covenant not to compete may be enforced only if (a) it satisfies general contract law requirements, (b) it is reasonable in scope and duration both geographically and temporally, (c) it advances a legitimate economic interest of the employer and (d) it survives a balance of the equities.

149. On October 21, 2016, Connie signed the Non-Compete Agreement, and Defendant Wegener signed on behalf of the Company.

150. The Non-Compete Agreement is unenforceable because

a.    Connie was fraudulently induced to sign the Non-Compete Agreement based on Defendant Wegener's representations (1) that she had to sign that day because an investment was contingent upon her signing, (2) that she did not have time to have the Non-Compete Agreement reviewed by an attorney because the investor was going to invest the next day if she signed, and (3) that the Non-Compete Agreement was prepared by an attorney and was favorable to her;

b.    Upon information and belief these representations were false when made because Company had no intent to seek an investment from that particular investor, and Company's true motive was to limit Connie's ability to compete with it after it terminated her employment a few weeks later;

c.    The Non-Compete Agreement is not supported by consideration;

d.    The Non-Compete Agreement does not contain any language limiting or even identifying the geographic scope of the covenant not to compete;

e.    The Company has no legitimate economic interest which can be protected by a covenant not to compete because

    i.    Connie had over two decades of experience in the carbon fiber manufacturing industry before she became an employee of Company;

    ii.    Connie was the inventor of the Carbon Fiber Process and therefore had full knowledge of it before she became an employee of the Company;

    iii.    Connie was an employee with full access to any potentially confidential information and valuable business relationships of Company for six (6) full months until she was fraudulently induced to sign the Non-Compete Agreement;

**iv.** Company allowed others such as Defendant Jacome and non-employees, such as the foreign nationals at Deakin University, to have access to the Carbon Fiber Process, confidential equipment designs, confidential customer and investor information, and confidential business plans and financial information without requiring them to enter into any restrictive covenants or execute a non-disclosure agreement; and

**v.** At the time Connie's employment was terminated, Company had no customers, had no relationships with vendors, had not begun manufacturing any products, and had no plans to manufacture any products until 2018 at the earliest.

151.    In light of the foregoing, Connie seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that the restrictive covenants contained in the Non-Compete Agreement are unenforceable against her and an award of her attorneys' fees pursuant to Section 20 of the Non-Compete Agreement.

**COUNT V**
**FRAUD**

152.    Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 151 by reference and further allege as follows:

153.    On October 11, 2016, Connie signed the Amended Operating Agreement after it was presented to her without prior notice at the Company's first Board meeting.  The Board meeting was called only hours before the meeting and shortly after Connie's mother had passed away.

154.    Defendants Wegener and LeMond represented to her that they needed to have the Board meeting because investors wanted to see that they were following corporate formalities by having Board meetings.  They also represented that the Amended Operating Agreement needed to be signed that day and was only to formalize the titles of Connie and Defendant LeMond.

1253248v2

155. Based on these representations, Connie signed the Amended Operating Agreement.

156. Upon information and belief, these representations were false when made, and Defendants Wegener and LeMond made these representations in order to induce Connie to sign the Amended Operating Agreement.

157. On October 21, 2016, Defendant Wegener presented Connie with the Employment Agreement and the Non-Compete Agreement and made the following representations to Connie:

a. that she had to sign the Employment Agreement and the Non-Compete Agreement immediately because a potential investor insisted that she sign the two agreements before it would make the investment

b. that there was no time to have an attorney review the agreements because the investor was prepared to make the investment the next day but only if it saw the signed Employment Agreement and Non-Compete Agreement that same day and

c. that Connie did not need to have an attorney review the agreements because they had been prepared by his attorney, they were the same as the employment agreement and non-compete agreement he had signed, and they contained terms very favorable to Connie.

158. Based on these representations, Connie signed the Employment Agreement and the Non-Compete Agreement the same day.

159. Upon information and belief these representations were false when made, and Defendant Wegener knew they were false when he made them.

160.   Upon information and belief, Defendant Wegener made these false representations for the purpose of inducing Connie to sign the Non-Compete Agreement knowing that the Company was going to terminate Connie's employment in the near future.

161.   Upon information and belief, Defendant Wegener made these false representations in order to keep Connie from using her decades of prior experience and contacts in the carbon fiber industry to obtain employment in the carbon fiber industry after the Company terminated her employment.

162.   All of the foregoing constitutes fraud, and Connie has suffered damage as a result in an amount to be determined at trial and including but not limited to, the value of all compensation Connie would have been paid pursuant to the Employment Agreement, or the compensation and benefits which Connie would have received had she not been fraudulently induced to terminate her employment at ORNL plus Connie's loss of the ability to earn a living and work in the industry in which she has worked for twenty-seven (27) years.

## COUNT VI
## BREACH OF CONTRACT AND WRONGFUL TERMINATION IN VIOLATION OF THE EMPLOYMENT AGREEMENT

163.   Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 162 by reference and further allege as follows:

164.   In the alternative, if the Employment Agreement is enforceable and not void due to fraud, pursuant to Paragraph 5 of the Employment Agreement, the Company was obligated to pay Connie a signing bonus of $80,000.00 in two installments of $40,000.00 each.

165.   The Company has breached the Employment Agreement by failing to pay the first installment of the signing bonus no later than fifteen (15) days after the execution of the Employment Agreement on October 21, 2016.

166.     Pursuant to Paragraph 3 of the Employment Agreement Connie's employment could be terminated only for "just-cause."

167.     To terminate Connie's employment for "just cause," the Company was required to provide her with at least two (2) written notices over a period of more than sixty (60) days before terminating her employment.

168.     The Company has breached the Employment Agreement by terminating Connie's employment without providing the required written notices over a period of more than sixty (60) days.

169.     The Company has breached the Employment Agreement by failing to pay Connie the severance payments to which she is entitled because her employment was terminated without "just cause."

170.     As a result of these breaches, Connie has been damaged in an amount to be proven at trial but not less than $380,000.00, plus the value of any benefits lost, plus prejudgment interest, post judgment interest, and her attorneys' fees pursuant to Section 26 of the Employment Agreement.

**COUNT VII**
**BREACH OF THE FIDUCIARY DUTY OF LOYALTY (DIRECT & DERIVATIVE)**

171. Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 170 by reference and further allege as follows:

172.     As owners and managers of Company, Defendants LeMond and Wegener each owed a fiduciary duty of loyalty to manage Company for the benefit of its members, including Connie.

173.     As the collective owners of 59% of the equity of Company, Defendants LeMond and Wegener had voting control over Company.

1253248v2

174.    Defendants LeMond and Wegener had operational control over Company as well because they refused to allow Connie access to Company's books and records, access to Company's financial information, or authority to write checks or make payments on behalf of Company.

175.    Defendant LeMond breached this fiduciary duty by using the Company's funds for his personal gain such as paying for his family's travel expenses to Paris, using the Company's funds to purchase office furniture for his son's business, and transferring Company funds from an escrow account intended to hold investors' money to LeMond Revolution, L.L.C. a company of which Defendant LeMond was an owner but which was not a subsidiary of the Company.

176.    Defendants LeMond and Wegener breached their fiduciary duty of loyalty by not taking reasonable steps to protect the Company's confidential technology and financial information, including but not limited to the Carbon Fiber Process, from disclosure, by sharing confidential information with employees and non-employees such as the foreign nationals at Deakin University without requiring a non-disclosure or non-compete agreement or some other protection for this information, and by allowing or ordering employees to take the Controlled Technology outside the United States and share it with foreign nationals at Deakin University without consulting with the BIS or taking any other steps to protect the Controlled Technology.

177.    Because the Controlled Technology includes information about the Carbon Fiber Process which Connie personally invented, Connie was personally damaged by the disclosure of the Controlled Technology without appropriate protections.

178. After learning about the foregoing acts, Connie complained to Defendants LeMond and Wegener and demanded that they take reasonable steps to protect Company's confidential information and the Controlled Technology, but both refused to do so.

179. Given the foregoing, and because Defendants LeMond and Wegener had both voting control and operational control of Company, it would have been futile for Connie to demand that Defendants LeMond and Wegener bring an action on behalf of Company to remedy their own breaches of their fiduciary duties.

180. As a result of Defendants LeMond and Wegener's breaches of their fiduciary duties of loyalty, Connie and Company have been damaged in an amount to be determined at trial.

## COUNT VIII
## BREACH OF THE FIDUCIARY DUTY OF CARE (DIRECT & DERIVATIVE)

181. Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 180 and further allege as follows:

182. As managers of Company, Defendants LeMond and Wegener owed its members, including Connie, a fiduciary duty of care.

183. Defendant LeMond violated his fiduciary duty of care by executing the Solve Contract without Board approval and thereby committing Company to pay a monthly fee of $63,000.00 at a time when it had only a license to use the Carbon Fiber Process for one (1) month, when it did not have operating production facility, and when it was still at least two (2) years away from producing a marketable product.

184. Defendants LeMond and Wegener breached their fiduciary duties of care by allowing including Defendant Jacome and non-employee foreign nationals at Deakin University access to Company's confidential information about the Carbon Fiber Process and the Controlled

Technology without requiring that they sign a non-disclosure or non-compete agreement or taking any other steps to protect the confidentiality of the Carbon Fiber Process or the Controlled Technology.

185.    Defendants LeMond and Wegener breached their fiduciary duties of care by failing to consult with the BIS or obtain any federal or state licenses or permissions before sending employees to Australia to meet with foreign nationals and allowing or ordering them to take the Controlled Technology outside the territorial boundaries of the United States and to disclose the Controlled Technology to foreign nationals.

186.    By allowing, ordering, or engaging in the foregoing, Defendants LeMond and Wegener failed to exercise good business judgment and to use ordinary care and prudence in the operation of Company's business.

187.    After learning about the foregoing acts, Connie complained to Defendants LeMond and Wegener and demanded that they take reasonable steps to protect Company's confidential information and the Controlled Technology, but both refused to do so.

188.    Given the foregoing, and because Defendants LeMond and Wegener had both voting control and operational control of Company, it would have been futile for Connie to demand that Defendants LeMond and Wegener bring an action on behalf of Company to remedy their own breaches of their fiduciary duties.

189.    Because the Controlled Technology includes information about the Carbon Fiber Process which Connie personally invented, Connie was personally damaged by the disclosure of the Controlled Technology without appropriate protections.

190.    As a result of Defendants LeMond and Wegener's breaches of their fiduciary duties of care, Connie and Company have been damaged in an amount to be determined at trial.

## COUNT IX
## WRONGFUL REMOVAL AS AN OFFICER AND MANAGER LEMOND COMPANIES

191. Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 190 by reference and further allege as follows:

192. Under Delaware law, an officer and manager of a limited liability company cannot be removed absent a provision in a limited liability company agreement. If the Amended Operating Agreement is unenforceable due to fraud and duress, then Defendants LeMond and Wegener's attempt to remove Connie as an officer and manager was in violation of Delaware law.

193. In the alternative, if the Amended Operating Agreement is found to be enforceable, as an officer and manager of Company, Connie could be removed only by unanimous consent of the Board unless the removal was for cause and then only by majority vote of the Board.

194. Defendant LeMond failed to give Connie notice of any meeting of the Board regarding her purported removal as a manager and officer.

195. Upon information and belief, Defendant LeMond failed to obtain either unanimous or majority Board approval prior to purportedly removing Connie an officer and manager of the LeMond Companies.

196. Accordingly, Defendants LeMond and Wegener's attempted removal of Connie as an officer and manager of LeMond Companies was done in violation of either Delaware law or the Amended Operating Agreement, and as a result such attempted removal is void and Connie is entitled to damages in an amount to be determined at trial.

**WHEREFORE, PLAINTIFFS CONNIE JACKSON AND JEFFREY JACKSON PRAY AS FOLLOWS:**

1253248v2

1. That process be issued and served upon each of the Defendants;

2. That a jury be empaneled to determine all matters within the purview of the jury;

3. That, this Court exercise its authority pursuant to, 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 to declare the rights and obligations of the parties under the Non-Compete Agreement and thereby determine that the purported restrictions in the Non-Compete Agreement are invalid and unenforceable;

4. That this Court enjoin Defendants Jacome, LeMond, and Wegener from any further violations of the Wire and Electronic Communications Interception and Interception of Oral Communications Act and award Connie and Jeff damages in an amount equal to the maximum allowed by law, punitive damages for the knowing and egregious conduct of the Defendants, and their reasonable attorney's fees and other litigation costs reasonably incurred in prosecuting this action;

5. That this Court enter judgment against Defendants LeMond Companies, LLC, LeMond Composites, LLC, LeMond, and Wegener for their violations of the FLSA in an amount equal to the federal minimum wage for each and every hour that Jeff worked plus overtime pay at a rate of one-and-one-half-times his regular rate of pay for each hour worked in excess of 40 hours in a workweek, plus an additional equal amount as liquidated damages, emotional distress damages prejudgment interest, and his attorneys' fees and costs in an amount to be determined at trial but no less than $65,000.00;

6. That this Court enter judgment against Defendants LeMond Companies, LLC, LeMond Composites, LLC, LeMond, and Wegener for their retaliation against Connie in violation of the FLSA in an amount equal to all back wages, plus an additional equal amount as liquidated

damages, emotional distress damages, prejudgment interest, and her attorneys' fees and costs in an amount to be determined at trial but no less than $300,000.00;

7.   That this Court award Connie compensatory damages sufficient to make her whole for the damage caused by Defendants' fraud in an amount to be determined at trial;

8.   That, if this Court finds the Employment Agreement is not void due to Defendants' fraud, this Court enter judgment against Defendant LeMond Companies, LLC for its breach of the Employment Agreement in an amount no less than $380,000.00 plus the value of any benefits lost as a result of Defendant's breach and award Connie her attorneys' fees pursuant to Section 26 of the Employment Agreement;

9.   That this Court enter judgement against Defendants LeMond and Wegener for their breaches of fiduciary duty in an amount to be determined at trial but no less than $1,000,000.00;

10.  That, if this Court finds the Amended Operating Agreement is void, this Court enter judgment against Defendants LeMond and Wegener for their attempt to wrongfully remove Connie as an officer and manager of LeMond Companies in violation of applicable common law in an amount to be determined at trial;

11.  That, if this Court finds the Amended Operating Agreement is not void, this Court enter judgment against Defendants LeMond and Wegener for their wrongful removal of Connie as an officer and manager of LeMond Companies, LLC in violation of the Amended Operating AGreement in an amount to be determined at trial;

12.  That this Court order an accounting of all of the books and records of LeMond Companies, LLC and LeMond Composites, LLC including, but not limited to, any records of payments made or funds transferred by either company to Defendants LeMond, Wegener, or

Jacome, or to any family member of any of the foregoing, or to any entity of which any of the foregoing is an owner, officer, manager, or director;

13. That this Court order the dissolution of LeMond Companies, LLC;

14. That this Court award Plaintiffs their attorney's fees and costs as provided by the FLSA the Wiretapping Act, and other applicable law and as provided in the Employment Agreement and the Non-Compete Agreement;

15. That this Court award Plaintiffs prejudgment interest and post-judgment interest; and

16. That this Court grant Plaintiffs any and all other legal or equitable relief as this Court may deem reasonable, just or necessary to make Plaintiffs whole and as shall be necessary and proper to effectuate the purposes of the Fair Labor Standards Act, the Wire and Electronic Communications Interception and Interception of Oral Communications Act and as justice requires.

Respectfully submitted this the 28th day of February, 2017.

/s/ *Melissa B. Carrasco*
Melissa B. Carrasco, BPR # 029094
EGERTON, MCAFEE, ARMISTEAD & DAVIS, P.C.
900 S. Gay Street, Suite 1400
Knoxville, TN 37902
Phone: 865-546-0500
Fax: 865-525-5293
Email: mbc@emlaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on February 28, 2017, the foregoing was filed via this Court's Electronic Case Filing system (ECF) and that notice will be sent by operation of the Court's electronic filing system to the following counsel of record:

> W. Tyler Chastain
> Daryl R. Fanlser
> BERNSTEIN, STAIR & MCADAMS LLP
> 116 Agnes Rd.
> Knoxville, TN 37919
>
>
> Lawrence M. Shapiro, P.A.
> Mark L. Johnson
> Karl C. Procaccini
> GREEN ESPEL PLLP
> 222 S. Ninth Street, Suite 2200
> Minneapolis, MN 55402

All other counsel or parties of record will be served via United States Mail, first class, postage prepaid.

> EGERTON, McAFEE, ARMISTEAD & DAVIS, P.C.
>
>
> By: /s/ *Melissa B. Carrasco*
>      Melissa B. Carrasco

1253248v2

37